UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO

---------------------------------------------------------
                                      :

Olin Clay, *et al.*,                 :          CASE NO. 5:04-cv-1262

                                        :

                Plaintiffs,         :

                                        :

vs.                              :          Memorandum

                                      :          [Resolving Doc. No. 33, 37]

United Parcel Service, Inc.,      :

                                      :

                Defendant.        :

                                      :
---------------------------------------------------------

JAMES S. GWIN, UNITED STATES DISTRICT JUDGE:

Plaintiffs Marie Moss, Olin Clay III, and Marcus Miller, raise claims for race discrimination, hostile work environment (Moss and Clay), and retaliation (Clay and Miller) against Defendants United Parcel Service, Inc. (UPS) and United Parcel Services of America, Inc. Defendants have moved for summary judgment, and Plaintiffs have responded. For the reasons that follow, the Court GRANTS the Defendants' motion in part, and DENIES it in part.

### I. United Parcel Service of America

At the outset, the Court notes that United Parcel Service of America is not a proper party to this action. It is a Delaware corporation with no employees. Def. Exh. 1, Declaration of Cathy Buck-Lehmann at ¶ 6. Plaintiffs are or were employed by United Parcel Service, Inc., an Ohio corporation. The Court thus grants summary judgment as to United Parcel Service of America. *See Calderon v. Southwestern Bell Mobile Systems*, No. 02 C 9134, 2004 Dist. LEXIS 25356 (N.D. Ill. Dec. 15, 2004) (in case with

Case No. 5:04-cv-1262
Gwin, J.

Section 1981 claim, stating that parent company not liable for the acts of its subsidiaries); *Hagemann v. Molinari*, 14 F. Supp.2d 277 (E.D.N.Y. 1998) (granting summary judgment on Section 1981 claim where defendant was not a party to the contract at issue) (citing *Murray v. National Broadcasting Co.*, 844 F.2d 988, 995 (2d Cir. 1988).

United Parcel Service, Inc., (UPS) remains a party to the suit.[1]

## II. General Background

UPS is engaged in the small package pickup and delivery business. When a UPS driver picks up packages from an Akron area customer, he takes the packages to the Akron UPS facility, where they are unloaded onto a conveyer belt, separated by zip-code, and loaded into feeder trucks for delivery to the appropriate hub. Similarly, when packages arrive in Akron, they arrive by feeder truck. Employees unload these trailers, sort packages according to route, and then load package cars for that route. This 'preload' operation begins at about 4:00am. Like sorters and loaders, preload employees are part-time employees who load package cars before the drivers report to work.

All three Plaintiffs in this case, like most UPS employees, are members of the International Brotherhood of Teamsters. The terms and conditions of their employment are detailed in a collective bargaining agreement between UPS and the Teamsters.

In the event of an employee complaint, the Collective Bargaining Agreement (CBA) includes procedures to resolve any "controversy, complaint, misunderstanding or dispute." Def. Exh. 3, CBA, at 172. After raising a grievance with one's immediate supervisor or union steward, an employee may

---

[1] The Plaintiffs amended their complaint to add United Parcel Service, Inc., on June 28, 2005.

Case No. 5:04-cv-1262
Gwin, J.

provide a written grievance to a steward who attempts to resolve the issue with the supervisor.  If the parties fail to agree on a resolution, the union must submit a written grievance to UPS.  Id.

When a party submits a written grievance, the parties attempt to resolve the conflict at the local level in a hearing before an equal number of union and company representatives.  If the parties cannot resolve the matter at the local hearing – that is, if the matter is "deadlocked" – then the grievance proceeds to a state committee or panel, consisting of an equal number of union and company representatives.  A decision at any stage of the process is final and binding.

### III. Legal Standard

#### A. Summary Judgment

Summary judgment is appropriate when the evidence submitted shows "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  In seeking summary judgment, the moving party has the initial burden of showing the absence of a genuine issue of material fact as to an essential element of the nonmoving party's case. *Waters v. City of Morristown*, 242 F.3d 353, 358 (6th Cir. 2001).  A fact is material if its resolution will affect the outcome of the lawsuit. *Daughenbaugh v. City of Tiffin*, 150 F.3d 594, 597 (6th Cir. 1998) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).   In deciding whether the moving party has met this burden, a court must view the facts and all inferences drawn from them in the light most favorable to the nonmoving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158-59 (1970).  However, "a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

Once the moving party satisfies this burden, the burden shifts to the nonmoving party to set forth

-3-

Case No. 5:04-cv-1262
Gwin, J.

specific facts showing a triable issue. *Matsushita Elec. Indus. v. Zenith Radio Corp.*, 475 U.S. 574, 586

(1986).  It is not sufficient for the nonmoving party merely to show that there is some existence of doubt

as to the material facts.  *See id.*

A factual dispute precludes summary judgment only if it is material, that is, if it relates to a matter

essential to adjudication.  The dispute must concern facts that, under the substantive law governing the

issue, might affect the outcome of the suit.  *Anderson*, 477 U.S. at 248.  The factual dispute also must be

genuine.  The facts must be such that if proven at trial a reasonable jury could return a verdict for the

nonmoving party.  *Id.*  "The disputed issue does not have to be resolved conclusively in favor of the

nonmoving party, but that party is required to present significant probative evidence that makes it necessary

to resolve the parties' differing versions of the dispute at trial."  *60 Ivy Street Corp. v. Alexander*, 822

F.2d 1432, 1435 (6th Cir. 1987) (citing *First Nat'l Bank of Arizona v. Cities Serv. Co.*, 391 U.S. 253,

288-89 (1968)); *see also Celotex*, 477 U.S. at 322.

B. 42 U.S.C. § 1981(a) and O.R.C. §§ 4112.02 and 4112.99

Plaintiffs bring their claims under 42 U.S.C. § 1981(a) and O.R.C. §§ 4112.02 and 4112.99.  The

elements of a prima facie claim under O.R.C. § 4112/02 and Section 1981 are identical to a Title VII

discrimination claim.  See Johnson v. University of Cincinnati, 215 F.3d 561 (6th Cir. 2000); Little Forest

Med. Ctr. V. Ohio Civil Rights Comm'n, 61 Ohio St.3d 607, 609 (1991).  The Court thus analyzes

Plaintiff's claims and Defendants' defenses according to the Title VII framework.

Below, the Court analyzes the facts and law with regard to each individual Plaintiff's claims.

**MARIE MOSS**

I. Facts

-4-

Case No. 5:04-cv-1262
Gwin, J.

Plaintiff Marie Moss was hired by UPS in 1976 and at all times pertinent worked at UPS's Akron Center at the Middleburg Heights Hub. Sometime near the beginning of her career, Moss began to work as a customer counter clerk, and stayed in that position for about twelve (12) years, until the position was eliminated. Moss Depo. at 27. She then moved to the position of "center clerk," which she held for about ten (10) years or so, until January 2001. *Id.* 29.

A. *Change of Operations and the Counter-Clerk Position*

In 2000, UPS decided to build another Center in Wadsworth, and the company conducted a "change of operations" meeting with union officials. "Change of operations" is a term defined by the Collective Bargaining Agreement. Under the relevant provision, whenever a Center is "partially closed" and the work of regular part-time employees is transferred or absorbed by another center, the affected employees are "entitled to follow their work." Pl. Exh. 1 (Article 38, Section (c)(2), p. 106); Pl. Exh. 2 (Art. 3, Section 6, p. 148). In addition, "[w]hen a new center is opened any new part-time support jobs created within thirty (30) days of the opening will be offered by seniority to existing part-time support employees from the affected centers." Pl. Exh. 2, Art. 3, Section 6, p. 148. Under Change of Operations, Moss wanted to transfer to the new Wadsworth Center. In November and December 2000, two months before the opening of the new center, Moss saw intent sheets posted for various part-time positions to be located at the new Wadsworth facility. When she saw the postings, she asked preload clerical supervisor Brian Bachiari when they would post an intent sheet for the counter-clerk position, the position she had once held at the Akron Center. The manager told her that UPS had already posted and taken down the intent sheet and that the position had already been filled. The parties do not dispute that the intent sheet was posted for about one week in August 2000, six months before the others were posted.

Case No. 5:04-cv-1262
Gwin, J.

Moss was working during that week.

Moss filed a grievance regarding UPS's failure to keep the intent sheet posted; she also wrote a letter to management expressing her interest in the counter-clerk position. "Intent sheets" are used by part-time employees, and "bid sheets" for full-timers. Bid sheets for full-time employees are typically posted for a specified amount of time, usually a week, in accordance with the Collective Bargaining Agrement. *See* Def. Exh. 2, Section 10, p. 164 ("The permanent new job or permanent vacancy . . . will be posted for a period of five (5) working days.") By contrast, the CBA does not outline a specified amount of time for intent sheet postings. *See id.* 165 ("Preferred job intent sheets will be posted in each part-time sort or part-time operation.") The parties do not dispute that, as a matter of practice, intent sheets (for part-time employees) were posted indefinitely, until shortly before the position would be open. *See, e.g.*, Terlop Depo. at 19-20. In this case, the intent sheet for counter-clerk was posted for only one week and removed some six months before the position became available. A white employee who had signed the intent sheet received the position.

*B. Job Assignments*

At the local grievance hearing, Moss stated her preference for the counter-clerk position. At the same time, she signed a posted intent sheet for her second preference, that of pre-load center clerk. The hearing deadlocked. The next day, human resources manager Mike Mick approached Moss and asked her whether she wanted to take her name off the pre-load clerk sheet. Moss did so, thinking it was necessary to secure the counter-clerk position. When she then asked to sign the intent sheet for customer-clerk, Mick told her the position had been filled. When she protested, Mick walked away. The Wadsworth pre-load clerk position, like the counter-clerk position, went to a white employee.

-6-

Case No. 5:04-cv-1262
Gwin, J.

Three days before the Wadsworth facility opened on February 2, 2001, Moss's immediate supervisor, Joe Terlop, told her that her current position was being eliminated and that she should report to the evening shift.  Moss was not offered any other positions in the new facility. Moss chose not to work the evening shift, and thus took and passed a test for a position in the primary sort.  Instead of being put on the primary sort, however, Moss was instructed to unload trailers, an unskilled job.  She then sought to move into "small sort," sorting smaller packages, in order to avoid heavy lifting.  Moss thought she could use her seniority to move into the position, although doing so would require displacing another, less-senior employee.  Terlop, however, assigned Moss to "boxline charger," a heavy-lifting position.  Moss was not qualified for the box-line position, and she failed the qualifying test.  However, Terlop did not move her.  On the boxline, Moss injured her groin and, as a result, left work for six months while on worker's compensation.  When an intent sheet was posted for the small-sort position, she signed and was awarded the position due to her seniority.   Moss was the only black female assigned to the East Sort.[2]

C. *Supervision by Joe Terlop and Work Environment*

Plaintiff Moss presented evidence that Terlop reproached her repeatedly about day-to-day issues such as her failure to get to her work station on time, about the route she took to get to her work station, and about stopping to get coffee or use the restroom before starting work.  At one point, Terlop, another supervisor George Yaniga, a union steward, and Moss, had a meeting about the route Moss walked to her work station (around the building rather than up two flights of stairs, across a catwalk, and down another

---

[2]Moss further avers that while a couple of black male employees worked as East Sort package-car loaders, they were not located at East sort.

-7-

Case No. 5:04-cv-1262
Gwin, J.

two flights of stairs), and one of them walked the preferred route with her.[3/]  On other occasions, Terlop criticized Moss for getting dropped off in front of the building rather than across the street, reading the newspaper during an employee's presentation, standing and talking to a fellow employee on work-time, and sorting through discarded boxes for personal use on work-time.  On one occasion, Moss was standing and eating a donut while she waited for a co-worker to give her a package he had asked her to take out at the end of the shift.  Terlop apparently noted that Moss had not clocked out yet, and approached her, stating that he did not pay her to stand around and eat donuts on work time.  According to Moss, Terlop regularly spoke to her in a berating and sarcastic manner in front of others, often yelling.  She testified that she felt threatened by Terlop and refused to be in a room with him alone.  In addition, Moss raises an instance where another supervisor, George Yaniga, criticized her for her slow working pace, and refused Moss's requests to have a union steward intervene and resolve the conflict.[4/]

## D. Hazmat Responder Training

In late 2002 or early 2003, Plaintiff spoke with Terlop about becoming a designated hazmat responder, a position that involved responding to and cleaning up leaks or spills from packages containing hazardous materials.  Each UPS facility has designated responders, who may be hourly or management employees.  Responders perform the hazmat function on top of their normal assigned duties.

---

[3/]According to Moss, she walked this route, "because I had a duffel bag in my hand and I had a thermos in my hand, and walking up and traveling the route that they wanted me to travel for me was not a good route with bifocals on having to look down at the step.  I had no rail to hold on because both of my hands were occupied."  Moss Depo. at 66.  Moss walked this route with others.

[4/]Moss also states that sometime in 1999, she was working on a trashcan and stools, because sometime in 1999, her desk was inexplicably removed from her station and placed in an area where no one used it.  She worked this way for about 1 1/2 years until she saw the mainetace men taking the building to throw away and asked them to return it.  Moss also states that while she was off on medical leave, someone broke the lock on her desk and removed her work supplies.

Case No. 5:04-cv-1262
Gwin, J.

Designated responders must be certified by a 12-hour training course, and recertified annually. Def. Exh. 3, CBA at 56.  Each facility may determine the number of hazmat responders it believes it needs. UPS is not obliged to have a set number of responders.  Initial selection for designated responders follows seniority. Id. But once certified, UPS need not consider seniority when determining who should respond to a particular leak or spill.  Exh. 1 (Lehman Dec. ¶ 7).

Moss was first qualified as a hazmat responder in 1992, when she first completed the training by UPS.  She was never instructed to respond to any spill or leak in the Akron facility, however. A white employee, Shelly Sponaugle, became a UPS employee around 1997 and a hazmat responder in 2000. Sponaugle and another white employee, Sara Lutz, were designated responders for the Akron Center preload operation.  At some point, Sara Lutz declined hazmat responsibilities and Shelly Sponaugle remained the only responder.

After signing an intent sheet and attending a training, Moss became recertified as a hazmat responder in November 2003 and again in November 2004.  After Moss and another employee, Jason Calhoun, completed their training, a UPS safety supervisor met with them to review certain hypothetical situations involving hazmat procedures and verify their agility with the respiratory equipment.  The safety supervisor stated that both needed improvement and further evaluation.  Calhoun was present for the evaluation, but Moss was not.[5/]  Since being certified and approved, Calhoun, a black employee, has been called to respond to leaks or spills when needed.  Moss Depo. 86-87.  At the time of her affidavit, in March 2005, Moss had only been called to respond to a hazmat leak once. She responded to a leak the

_____

[5/]Moss had apparently asked to meet with the evaluator on another day, but the message failed to be transmitted.

-9-

Case No. 5:04-cv-1262
Gwin, J.

week before the writing of the affidavit "because corporate hazardous materials supervisor directed center management to have [her] respond."  Moss Aff. ¶ 67.

## II. Analysis

Plaintiff Moss raises two claims in this action: hostile work environment and disparate treatment. The Court addresses each below.

### A. Hostile Work Environment

Under Title VII, a plaintiff may show unlawful discrimination by demonstrating that a hostile work environment exists.  In order to make out a prima facie case of hostile work environment based on race, a plaintiff must show that (1) she belongs to a protected group; (2) she was subjected to unwelcome harassment; (3) the harassment was based on race; (4) the harassment had the effect of unreasonably interfering with the plaintiff's work performance by creating an intimidating, hostile, or offensive work environment; (5) the employer knew or should have known of the harassment in question and failed to take appropriate remedial action.  *Hafford v. Seidner*, 183 F.3d 506, 512 (6th Cir. 1999) (citation omitted). Where the harassment is allegedly committed by a supervisor with immediate authority over the victim, the plaintiff employee need only satisfy the first four elements set out above.  *Faragher v. City of Boca Raton*, 524 U.S. 775 (1998).

As to the fourth prong listed above, the Supreme Court has stated that a hostile work environment occurs "when the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive work environment." *Harris v. Forklift Sys, Inc.*, 510 U.S. 17, 21 (1993) (internal quotations and citations

Case No. 5:04-cv-1262
Gwin, J.

omitted).  The plaintiff must meet both a subjective test and an objective test: "the conduct must be severe

or pervasive enough to create an environment that a reasonable person would find hostile or abusive and

the victim must subjectively regard that environment as abusive." *Bowman v. Shawnee State Univ.*, 220

F.3d 456, 463 (6th Cir. 2000) (citing *Harris*, 510 U.S. at 21-22).

> The court must consider the totality of the circumstances when determining whether,
> objectively, the alleged harassment is sufficiently severe or pervasive to constitute a hostile
> work environment.  *See Williams v. General Motors Corp.*, 187 F.3d 553, 560-61 (6th
> Cir. 1999).  'The issue is not whether each incident of harassment standing alone is
> sufficient to sustain the cause of action in a hostile environment case, but whether – taken
> together – the reported incidents make out such a case.' Id. The work environment as a
> whole must be considered rather than a focus on individual acts of alleged hostility.  *See
> id.* at 563.  Isolated incidents, however, unless extremely serious, will not amount to
> discriminatory changes in the terms or conditions of employment. *See Morris v. Oldham
> County Fiscal Court*, 201 F.3d 784, 790 (6th Cir. 2000).  Appropriate factors for a
> court to consider when determining whether conduct is severe or pervasive enough to
> consitute a hostile work environment 'include the frequency of the discriminatory conduct;
> its severity; whether it is physically threatening or humiliating, or a mere offensive utterance;
> and whether it unreasonably interferes with an employee's work performance.' *Harris*,
> 510 U.S. at 23.

*Bowman*, 220 F.3d at 463.

In this case, Plaintiff Moss, a black woman, has presented evidence that her supervisor, Joe Terlop,

and supervisor George Yaniga, berated her over relatively minor conduct, such as eating a donut on work

time, or failing to walk the shortest route to her work station.  Moss  meets the first two prongs.  Moss has

failed, however, to present a genuine issue of fact with regard to the third and fourth prongs.

Moss has supplied insufficient evidence to raise a triable issue that she was harassed on account

of her race.  She presents no evidence that supervisors made any racially derogatory statements.  Nor has

she presented sufficient evidence that her supervisors' facially neutral conduct was race-based.  *See*

-11-

Case No. 5:04-cv-1262
Gwin, J.

*Bowman*, 220 F.3d at 463-64 (noting, in analogous context, that "non-sexual conduct may be illegally sex-based and properly considered in a hostile environment analysis where it can be shown that but for the employee's sex, he would not have been the object of harassment") (citing *Williams*, 187 F.3d at 565); *Oncale v. Sundowner Offshore Serv., Inc.*, 523 U.S. 75, 80 (1998) ('The critical issue, Title VII's text indicates, is whether members of one sex are exposed to disadvantageous terms or conditions of employment to which members of the other sex are not exposed.'(citation omitted)).

Here, the only evidence Moss presents that supervisor Terlop's treatment of her was race-based are the speculations and perceptions of two co-workers, as well as her own opinion. Co-worker Sue Starkey's affidavit generally references instances of perceived differential treatment, but lacks sufficient detail to raise a triable issue. For instance, Starkey stated that whereas she and other white employees never got reprimanded for stopping at the restroom after a break, Terlop would stop Moss and reprimand her "in a very hostile manner." Starkey Aff. At ¶ 12. In addition, Starkey stated that while Terlop berated Moss in front of everyone for eating a doughnut at 8:54am, 6 minutes before her clock-out time of 9am, on a different occasion, a white employee, Shelly Spinaugle, took an entire plate of food to eat while still on the clock, and "Terlop said nothing." Starkey Aff. At ¶ 18. These statements do not, however, reflect anything more than Starkey's own general perceptions. Starkey's affidavit does not specify whether Terlop knew about the white employees' conduct; nor can she accurately speak for the other employees and the discipline they may have received, because she lacks personal knowledge.

Similarly, co-worker and union steward Gary Allensorth stated, in his sworn affidavit, that Terlop berated Moss for taking the long route to her work station and did so only "as it related to Marie."

-12-

Case No. 5:04-cv-1262
Gwin, J.

Allensworth Aff. ¶6.  In addition, in contrast to Moss's reprimand for eating, he stated, "I have seen supervisors stand around drinking coffee while on duty." Id. At ¶ 7.  In her own affidavit, Moss charges that white employees who engaged in the same conduct were not similarly harassed for similar conduct. In her deposition, she testified that when she observed white co-workers Carl Tellini and Shelly Sponaugle refusing to follow instructions, they were not reprimanded for their conduct as she was.

As with Starkey, however, Allensworth and Moss's statements amount to perceptions and are insufficient to create a genuine issue of fact that Terlop treated Moss badly on the basis of her race. *See Bowman* 220 F.3d at 464 (claim of hostile environment insufficient to survive summary judgment, where plaintiff had made only a "bare and unsupported assertion" that comparators were allowed to engage in work that plaintiff was not). Plaintiff has produced no evidence that supervisors failed to discipline the white employees she references. Indeed, Plaintiff fails to rebut Defendant's evidence that Terlop disciplined white and black employees alike when they were late reaching their work stations at the beginning of their shifts or after a break. *See* Terlop Dec.; Exh 2 attached to Terlop Dec. (Memo to supervisor detailing nine other employees, one black and the rest white, who were disciplined for lack of timeliness).

Even if Moss could establish that UPS supervisors had harassed her because of her race, her hostile environment claim would fail, because she cannot show that the harassment was so "severe or pervasive" as to unreasonably interfere with her work performance. Moss recites a number of reprimands, over a period of about seven months between 2001 and 2002, and again over a period of months in 2003 (it appears she was off work at some point toward the end of 2002). According to Moss, as well as white co-worker Sue Starkey, the reprimands were threatening and/or humiliating. As Moss put it, Terlop had

-13-

Case No. 5:04-cv-1262
Gwin, J.

a "volatile demeanor" around her, and she "refused to be in the same room with him without somebody in there."  Moss Depo. at 213-14.

Despite her perception of being threatened, the incidents Moss complains of do not rise to the level of "severe or pervasive" ridicule, insult, or intimidation contemplated by Title VII.  First, while Starkey states that Terlop spoke to Moss in a berating manner almost daily, the specific incidents Moss complains most about were somewhat isolated.  Moss has produced about fifteen memos from her file, spanning Fall 2001 to Fall 2003, in which her supervisors noted some incident.  Second, the incidents are not severe. Among the fifteen incidents for which there is documentation, the most egregious appear to be Terlop's failure to remove her from the boxline although the work was too strenuous for her; the doughnut incident in November 2001; and her supervisors' timing her walk route in July 2001.  She also notes an instance where supervisor Yaniga criticized her slow working pace and wouldn't allow a union steward to intervene, as well as an instance where Terlop commented with disfavor about her earrings.  Finally, she notes that UPS management removed her supplies from her work station when she was out on leave. Cases of far more severe humiliation and ridicule have been held not to violate Title VII.  *See Smith v. Leggett*, 220 F.3d 752, 760-61 (holding unactionable a situation where low-level employees made racially offensive comments over a period of 20 years); *Burnett*, 2000 WL 145825 at *5 (holding that the occurrence of three sexually offensive remarks by the plaintiff's personnel manager spread out at the beginning and at the end of a six-month period were not commonplace, ongoing, or continuing and therefore not pervasive discriminatory conduct).   At most, Moss's treatment amounts to "mere offensive utterances," which the Supreme Court has held insufficient to support an action.

-14-

Case No. 5:04-cv-1262
Gwin, J.

Moss's hostile environment claim thus fails as a matter of law.

### B. Disparate Treatment

Moss claims four general instances of disparate treatment. First, she claims that UPS failed to permit her an opportunity to sign an intent sheet for her first-choice position of counter-clerk, and the position went to a white employee. Second, she claims that a supervisor induced her to remove her name from consideration for a position that then went to a white employee. Third, she claims that UPS refused to honor her seniority to displace a junior employee in a position she preferred, after her own position had been eliminated. Finally, she claims that UPS failed to allow her to work as a hazardous material ("hazmat") responder, and instead gave all such opportunities to a less competent white female. Moss's claims fail as a matter of law.

In order to raise a triable issue of fact on a claim of disparate treatment where there is no direct evidence of racial discrimination, a plaintiff must meet the familiar four factors laid out in *McDonnell Douglas v. Green*.  A plaintiff must show that she (1) is a member of a protected class; (2) suffered an adverse employment action; (3) was qualified for the position she sought or lost; and (4) was treated less favorably than a similarly situated white employee. *Braithwaite v. The Timken Co.*, 258 F.3d 488, 494 (6th Cir. 2001).  To win on the fourth prong, a plaintiff must show that a comparable, non-protected employee was similarly situated to her in all relevant aspects, yet treated more favorably by the Defendant. *Clayton v. Meijer, Inc.*, 281 F.3d 605,  611 (6th Cir. 2002).

Once the Plaintiff makes out a prima facie case, the burden shifts to the Defendant to put forth a legitimate, non-discriminatory reason for the employment decision.  The burden then shifts back to the

-15-

Case No. 5:04-cv-1262
Gwin, J.

Plaintiff to prove that the Defendant's proffered reason was pretextual.

Here, Defendant UPS does not dispute that Plaintiff Moss has met the first three factors.  The only disputed issue, then, is whether Plaintiff has met the fourth prong of the *McDonnell Douglas* test.  In order to prove this fourth prong, Moss may show either that she was treated less favorably than a similarly situated white employee, or that she was replaced by a non-protected employee. *Talley v. Bravo Pitino Restaurant,* 61 F.3d 1241, 1246 (6th Cir. 1995); *Barnes v. GenCorp., Inc.*, 896 F.2d 1457, 1465 (6th Cir. 1990). In failure-to-promote cases, the fourth prong can be shown by proving that the position remained open or was filled by a non-protected employee.

### 1. Counter-clerk intent sheet

With regard to Moss's claim that UPS wrongfully denied her the counter-clerk position – the position that she held before it was eliminated in the mid-90s – Moss can show that a white employee was hired.  Moreover, for positions for which one is otherwise qualified, seniority is the only relevant factor in filling the position.  Moss was more senior than the individual who ultimately got the position.  Thus, she sets out a prima facie case.

UPS, however, puts forward a legitimate, non-discriminatory reason for the decision: As she concedes, Moss did not sign the intent sheet that would have made her eligible for consideration. The position went to the senior-most employee who did sign the sheet.  The sheet was posted for one week in August 2000, a week during which Moss was working.

Moss suggests that UPS's reason is pretextual.  A plaintiff can refute an employer's alleged legitimate, non-discriminatory reason by showing that the proffered reason either (1) has no basis in fact;

-16-

Case No. 5:04-cv-1262
Gwin, J.

(2) did not actually motivate the decision; or (3) is insufficient to warrant the decision. *Johnson v. Kroger Co.*, 319 F.3d 858, 866 (6th Cir. 2003). Here, Moss appears to argue the third basis. She argues that UPS's reason is pretextual because the intent sheet was only up for one week, and was up six months before the position would be available, whereas by common practice, intent sheets (for part-time workers only) were posted until about one or two weeks before a given position opened.

The parties do not appear to dispute that this was the only intent sheet that was taken down so quickly and so well in advance of the opening of the new center, although the evidence also suggests that the intent sheet was posted in the place where all other intent sheets are posted and that Moss was working during the time that it was up. The evidence also shows, however, that, because of her seniority, Moss would likely have received the job had she signed. *See* Pl. Exh. 63 (Letter from supervisor Dave Carroll, on behalf of UPS, to state panel, April 29, 2002) ("The job was awarded to Tim Gradwohl who has a seniority date of April 21, 1995. Marie failed to sign the intent sheet. Marie has a seniority date of June 23, 1976, and would have easily been awarded the job."). Tim Gradwohl's name, with his seniority date listed alongside, is the third and last name on the intent sheet. *See* Pl. Exh. 60.

These facts, however, do not create a material issue of fact by which a jury could infer that UPS was motivated by race when it took down the intent sheet. "The mere fact that an employer failed to follow its own internal procedures does not necessarily suggest that the employer was motivated by illegal discriminatory intent." *Randle v. Aurora*, 69 F.3d 441 (10th Cir. 1995). Although Moss, unlike the plaintiff in *Randle*, had more seniority than the white employee who ultimately got the position, Moss has not suggested that management knew of her interest before they posted the intent sheet and filled the

-17-

Case No. 5:04-cv-1262
Gwin, J.

position.  She wrote a letter only after the position had been filled.  Moreover, she has not proven that she was directly or uniquely disadvantaged by UPS's failure to follow its posting procedure: The irregularity disadvantaged all potential applicants, and it appears there were over a hundred employees who might have been eligible.

Moss thus does not show disparate treatment in UPS's failure to give her the customer clerk position.

### 2. Pre-load clerk position

Second, Moss argues that she suffered disparate treatment when she was denied the pre-load clerk position at the new Wadsworth facility.  As with the counter-clerk position, Defendants only challenge her claim as to the fourth prong, whether she was "similarly situated."  The pre-load position went to a less-senior white employee who, like Moss, had signed the intent sheet.  Moss thus sets out a prima facie case.  UPS suggests that because Moss took her name off the intent sheet, she was not similarly situated to the other employees.  However, because Moss challenges the legitimacy of the intent sheet, UPS's argument seems better characterized as putting forward a legitimate, nondiscriminatory reason for the decision.  Moss challenges this reason as pretext, on the basis that she was wrongly induced to remove her name from the sheet.

Moss has produced evidence that she told Mike Mick at the grievance hearing that she wanted the pre-load clerk position if she couldn't get her first choice, the counter-clerk position.  She further avers that, despite the fact that she articulated her interest, Mick approached her the day after the hearing and said, "You wanted to take your name off the pre-load clerk position," handed her the intent sheet, and indicated

-18-

Case No. 5:04-cv-1262
Gwin, J.

for her to sign and initial.  After she signed, she asked Mick for the counter-clerk intent sheet.  He told her

the position was filled.  She avers that despite her protests, Mick then walked away without responding.

Finally, Moss produces evidence that she was the senior-most person on the intent sheet and would have

been given the position.  *See* Pl. Exh. 63 (Feb. 2, 2001, Letter from Akron Division Manager Bruce

Walker to Marie Moss).

UPS does not contest Moss's version of events regarding her interaction with Mick.  It simply relies

on the fact that Moss crossed her name off the sheet.  Moss has also pointed out that UPS was required

to offer her the opportunity to "follow her work" to the new center, because of her seniority.  She says the

CBA further required that management meet with her 45 days prior to the change to discuss her option to

move.  Exh. 2, Art. 3., section 6, p. 148.  It did neither of things.  Nor did it offer her any other positions

in the new facility, which it was required to do pursuant to the CBA.

These facts sufficiently create an issue of fact that UPS's stated reason for its employment decision

– that Moss crossed her name off the sheet – is pretextual.

### 3. "Small sort" Position

Moss also argues that UPS failed to allow her to use her seniority to transfer into the "small sort"

position.  She claims white employees were able to use their seniority to move into the positions they

wanted to.  Moss's argument lacks merit.

First, evidence shows that she was indeed able to use her right to displace a junior employee when

she moved to the primary sort after her previous job was eliminated.  The CBA did not give her the right

to "bump" into a position and displace a junior employee unless it was as a result of a lay-off.  *See* Def.

-19-

Case No. 5:04-cv-1262
Gwin, J.

Exh. 3, CBA at 166. Here, Moss argues that she should have been able to transfer simply because the position was not a good fit, not because the primary sort job was eliminated. In addition, the comparable employees she cites – Dennis Mitchell, Chris DiFrangia, and Louis Augustus – "bumped" into positions after they were laid off, not because they were dissatisfied with their position. These employees also may not have been similarly situated to Moss because each of these employees were full-time drivers and thus had different collectively bargained-for rights than Moss, a part-time employee. *See id.* at 160 (allowing full-time employees to bump one or two part-time employees for the duration of a layoff period). Thus, Moss cannot support a disparate treatment claim on this basis.

### 4. Hazmat Responder Position

Moss's final complaint is that UPS did not assign her "hazmat" responder duties, a position that required responding to leaks or spills. In this case, Moss cannot show that a similarly situated white employee was treated more favorably than she was, where she was also qualified for the job. At the time that Shelly Sponaugle became the designated hazmat responder on the preload, Moss was not qualified for the position. A hazmat responder must be recertified annually, and Moss was not recertified after being initially qualified in 1992. Once she was recertified in November 2003, Moss had no contractual right to be called to respond to spills before other, more experienced designated responders such as Sponaugle.

The more relevant comparator is Jason Calhoun, a black employee, who was certified at the same time as Moss. Unlike Moss, Calhoun does appear to have been called to respond to leaks and spills. However, because he is a member of the same protected class as Moss, this comparison is irrelevant. In

Case No. 5:04-cv-1262
Gwin, J.

addition, Calhoun appears to have been present at a follow-up safety evaluation that Moss missed.

Because Moss cannot show she was similarly situated to to a non-protected white employee, her claim of disparate treatment on the basis of hazmat responsibilities fails.

In sum, Moss raises material issues of fact with regard to one basis upon which she argues disparate treatment, but not as to the remaining three.

## MARCUS MILLER

### I. Facts

Plaintiff Marcus Miller was first employed by UPS in 1989 and worked at the Akron Center up until his termination in November 1999.  Until May 1999, Miller worked the "preload," or morning shift. In 1997, Miller expressed an interest in transferring to the primary sort position.  However, the company never posted an intent sheet for the position, nor did it test Miller for the position so that he could "pre-qualify," should the position ever become open.  At some point, Miller observed other, white, employees obtain the position.  Miller grieved UPS's failure to post an intent sheet.  On the grievance, he listed four white employees who shared his complaint.

Miller complains about two job actions: first, his termination and reinstatement in March-April 1999, the second, his final termination in November 1999.  In Fall 1998, Miller received one- and two-day suspensions for absenteeism and tardiness.  In March 1999, Miller was terminated for attendance violations.  He grieved the termination, and, after deadlock at the local hearing, a state panel heard his grievance. Like other employees who had been subject to similar progressive discipline, Miller was reinstated by the state panel.  Unlike other employees, however, Miller's reinstatement was accompanied

-21-

Case No. 5:04-cv-1262
Gwin, J.

by a 25-day suspension, greater than the 5-day and 15-day suspensions given other employees.  The state

panel's decision acted as a final warning.

On May 17, 1999, Miller returned to work after serving his suspension.  When he returned, he

learned that UPS was moving him to a different shift - rather than the early morning preload shift he had

occupied before his suspension, supervisor Mike Delagrange told him to report to "reload," an afternoon

shift.  Although he did not file a grievance to contest the change, Miller verbally expressed his concern that

the change would result in schedule conflicts for him.  Throughout the summer and fall, he repeatedly

requested to be put back on the preload operation. *See, e.g.,* Miller Depo. at 333-34 (referencing letter

from Miller to management requesting "serious consideration" for his request).  At one point, Mike Smith,

a reload supervisor, told Miller to put a transfer request in writing to Human Resources. Miller observed

two white employees transferring to new positions, at least one out of preload, without having to file

paperwork. No intent sheet, however, was posted to indicate an opening in preload.  At some point in

May, Miller filed a discrimination charge with the EEOC, grieving his initial termination and reinstatement

with 25-day suspension.

The first few days after he returned to work in May 1999, Miller avers he was off sick, and in

addition that he had schedule conflicts.  Thereafter, he says he regularly "called in" or "scheduled off" days

of work, due to his schedule conflicts.  According to Miller, one of his supervisors, Gerard Colant, told him

he would try to get him a position on the preload; another supervisor, Mike Smith, told him he would

schedule Miller off until he either got a position on preload or worked out his schedule conflict.  Miller

Depo. 323-24; Miller Aff. ¶ 32.

-22-

Case No. 5:04-cv-1262
Gwin, J.

On September 27, 1999, Smith told Miller that he could no longer schedule Miller off, and that instead Miller would have to "call in" on a daily basis.  Miller Depo. 331.  According to Miller, Smith did not raise concerns with Miller's absenteeism.  Miller complied with Smith's request to call in.  When he would call in, Miller would ask whether the load was light, and if light, then whether he could take the day off.  Miller avers he called in every day until November 11, 1999.  Between September 27, 1999, and November 11, 1999, he missed work – either because he "called in" or "scheduled off" – a total of sixteen (16) days.

On November 11, 1999, when Miller called in to work, he learned that he had been terminated.  The following day, Miller received a letter notifying him that UPS had terminated him pursuant to Article 16 of the Collective Bargaining Agreement, "Unauthorized Leave of Absence."  On November 16, 1999, he received a letter from UPS, dated November 5, 1999, that stated, roughly: "We have no current documentation justifying your absence since October 29, 1999.  Please contact Mike Smith with this required documentation.  If we don't receive it, we'll consider your employment terminated."  *See* Miller Depo.[6/]  The letter gave Miller until November 10, 1999, to provide the requisite documentation.  Although he received the letter late, Miller did not produce the requested support for his absences.  Not receiving it, UPS terminated Miller for "unauthorized leave of absence."  A state panel upheld Miller's termination.

## II. Analysis

Plaintiff Miller raises claims of disparate treatment and retaliation.

---

[6/]The Court notes that neither party has supplied the Court with a copy of the November 5 letter, or the termination letter.

Case No. 5:04-cv-1262
Gwin, J.

### A. Disparate Treatment

Miller contends that he suffered disparate treatment in three different instances: first, when UPS allegedly failed to post an intent sheet regarding a position that was eventually filled by two white males; second, when he received a 25-day suspension for attendance and tardiness problems, whereas similarly situated white employees received 15- and 5-day suspensions or less; third, when UPS terminated Miller after Miller returned to work after his 25-day suspension. Miller fails to establish a genuine issue of fact as to any of the three.

### 1. Sort-Aisle Position

Miller first claims that UPS unlawfully refused to place him in a position - the sort aisle - and instead filled the position with less senior white males.  In particular, Miller complains that UPS failed to post an intent sheet that would have made him eligible for consideration.  Miller does not dispute, however, that when he brought a grievance against UPS for failing to post an intent sheet, he did so on behalf of himself and four white employees, all of whom had been denied the opportunity to sign the intent sheet. Def. Exh. 4, Miller Dep. at 123-28.  Miller does not contend that he was any more senior than these four employees, or that he was any more likely to get the sort-aisle position than they, had he signed the sheet.  Thus, the fact that they had the same complaint he had belies his argument that UPS's failure to post an intent sheet was motivated by race.[7]

---

[7]UPS also argues that Miller was not qualified for the position, and thus did not meet the second prong of the McDonnell Douglas test. Plaintiff, however, argues that UPS never bothered to test him, to determine whether he was qualified or not.  This Court need not decide whether Miller met the second prong or not, because the Court finds that Miller fails to establish that he was treated less favorably than similarly situated employees, in this case, white employees who wanted the position and did not have the opportunity to sign the intent sheet.

-24-

Case No. 5:04-cv-1262
Gwin, J.

### 2. 25-day suspension

Second, Miller contends that UPS gave him a harsher suspension for his absenteeism and tardiness than it gave similarly situated white employees.  The parties do not appear to dispute that Miller received appropriate progressive discipline for his attendance problems, or that other white employees were similarly subjected to progressive discipline for similar problems.  Plaintiff's main contention is that Miller received a 25-day suspension when he was reinstated by the state panel, whereas white employees with more egregious attendance records received suspensions between 2 and 15 days.

UPS does not contest that a discrepancy exists between the discipline received by Miller and that received by the other white employees.  Instead, it points out that the party making that decision was not UPS, but, rather, a joint labor-management committee that included union representatives as well as company representatives.  It states that UPS therefore cannot be held accountable for discipline meted out by the state panel.  The Court agrees with UPS.

Evidence suggests that UPS complied with the state panel's directives to reinstate Miller with the given amount of suspension, just as it complied with the state panel's directives to reinstate and suspend white employees Randy Jacim, Carrie McCourt, and Dan Paumier. And, absent  further evidence of bias, the state panel's decision was entitled to the same high level of deference accorded labor arbitration. *See Mastrobuono v. Local Union No. 673, Int'l Bhd of Elec. Workers*, 828 F.2d 19, Nos. 85-3303, 85-3304, 1987 U.S. App. LEXIS 1648 (6th Cir. Sept. 1, 1987).

Miller also contends that UPS treated him differently from the others - and did not comply with the state panel's directive - when, upon his return, it placed him in a reload position, rather than the sort

-25-

Case No. 5:04-cv-1262
Gwin, J.

position he had held earlier.  Although Miller avers that this change in shift caused him schedule conflicts, the change itself does not appear to have been out of line with the state panel directive, insofar as the re-load position involved the same work as the pre-load position Miller held prior to his suspension, just at a different time. Miller's affidavit, which refers only to the schedule change, and not to any change in tasks, reflects this. *See* Miller Aff. ¶¶24-27.

The more relevant comparison, then, is between the progressive discipline accorded white employees and that accorded Miller.  The evidence shows that up until the point of initial discharge and state panel reinstatement, Miller and white employees alike were subjected to the same steps of progressive discipline – a warning letter, followed by a one-day suspension and then a two-day suspension, then termination followed by a  hearing in the case of a grievance. Because Miller cannot show that on this relevant comparison, UPS treated him less favorably than similarly situated white employees, his claim of disparate treatment fails as to this basis.

### 3. Termination

Finally, Plaintiff Miller argues that UPS treated him differently from white employees when it terminated him in November 1999, after he had been reinstated. Specifically, Miller argues that UPS disparately enforced its supposed attendance policy against him, and did so unjustly, insofar as supervisor Mike Smith allegedly knew of Miller's schedule conflicts and allegedly had told Miller to schedule days off until he could get back on preload.

UPS responds that Miller fails to show he was treated less favorably than similarly situated white employees, because, of the employees he cites – Carrie McCourt, Shawn Betz, and Rebecca Lord – he

-26-

Case No. 5:04-cv-1262
Gwin, J.

was the only one issued a "final warning." These three employees all received letters terminating them for

unauthorized leaves of absence around the time that Miller did.  They were all reinstated, while Miller was

not.  Insofar as Miller argues that he should have been reinstated, as the other employees were, his

argument fails for the same reason it did with regard to the 25-day suspension.  A joint union-UPS

committee made the decision to reinstate the other employees, not UPS.  *See supra.*  Insofar as Miller

argues that UPS itself enforced its policy selectively, Miller has not produced the other employees' records,

to show whether they were absent a similar number of days as he was.

In addition, Miller has not produced the records of anyone in the "final warning" stage, such as he

was, to compare UPS's treatment at around the time he was discharged.  Some evidence shows that

Rebecca Lord, a white UPS employee, was disciplined differently for absenteeism after being reinstated

with a suspension and final warning.  *See* Def. Exh. 86 (series of letters, two of which referenced final

warnings received at local level hearings).  Unlike Miller, Lord was not disciplined with termination; instead,

she received another suspension and warning.  *See* Def. Exh. 86 (Feb.2, 2002 Letter re: Lord's final

warning, April 8, 2002 Letter referencing Lord's 3-day suspension, Oct. 7, 2002 Letter re: absences).

However, Lord's discipline came two years after Miller's termination.  At that time, she may have gained

in seniority and the exigencies of the workplace may have been different.  Further, she had different

supervisors than Miller had, and Miller has suggested no reason why in this case the Court should not

follow the rule set out in *Mitchell v. Toledo Hospital* that  similarly situated employees have the same

supervisor.  *See* 964 F.2d 577 (6th Cir. 1992).

Similarly, the evidence shows that Dan Paumier, a white employee who, like Miller, had grieved

-27-

Case No. 5:04-cv-1262
Gwin, J.

his termination and had been reinstated by a state panel with a suspension, presumably also at the "final warning" stage, had a number of "scheduled off" days after reinstatement, in fact, over seventy such days, compared to Miller's twenty-six. Again, though, these days were in 2003-04, not in 1999-2000.[8/]  Miller has not produced evidence to suggest Paumier's reasons for being absent.  Further, he has produced no evidence to suggest that Paumier had had an "unauthorized leave of absence" and was still retained.  Thus, Miller cannot show that Paumier was a similarly situated employee.

Finally, Miller claims that white employees Voss and Caporetti took scheduled days off with no repercussion.  However, no evidence suggests that these employees were in the "final warning" stage of discipline.

Thus, Miller has presented no issue of fact that he was treated less favorably than a similarly situated white employee.[9/]

Even if Miller could make out a prima facie case, UPS gives a legitimate, nondiscriminatory reason for the termination: Miller had an "unauthorized leave of absence" between October 29, 1999, and November 5, 1999.  In addition, he was "scheduled off" or "called in" absent forty-seven (47) days since his suspension, around sixteen (16) of those since September 27, 1999, when Mike Smith told him he had

---

[8/]Plaintiff claims that Defendant did not turn over Paumier's 1999 records.  This works in Plaintiff's favor to an extent, but Plaintiff has not shown that it further attempted to depose or get any written statement from Paumier.

[9/]Alternatively, in order to meet this facet of the prima facie test, Miller need only show that he was replaced by a white employee, meaning that a white employee was hired or reassigned his duties.  *Barnes v. GenCorp., Inc.*, 896 F.2d 1457, 1465 (6th Cir. 1990).  Since neither party raises this possibility with regard to Miller, this Court declines to address it.

Case No. 5:04-cv-1262
Gwin, J.

to call in everyday.[10]

A plaintiff can refute an employer's alleged legitimate, non-discriminatory reason by showing that the proffered reason either (1) has no basis in fact; (2) did not actually motivate the decision; or (3) is insufficient to warrant the decision. *Johnson v. Kroger Co.*, 319 F.3d 858, 866 (6th Cir. 2003).

Miller argues that UPS's reason was pretextual on a few bases: (1) UPS was aware of and had accommodated Miller's schedule conflicts, conflicts that UPS itself created by putting him on reload rather than preload after his suspension; (2) UPS gave Miller no warning that his termination was imminent, despite the fact that he was calling in every day since October 29, 1999; (3) Miller did not receive the letter advising him to contact UPS until November 16, 1999, eleven days after the letter was dated and six days after he had already been terminated.[11]

Although Miller claims that he called in every day between October 29, 1999, and November 5, 1999, his work record reflects that he failed to call in or give justification for missing those days. Further, UPS provides evidence to suggest that, at least one time in May, UPS sent Miller a letter asking him to justify his absence or else face termination. He was therefore familiar with the policy and the process. Finally, although the long delay in getting the letter is somewhat unsettling, Miller has not produced a postmark date, and therefore has not shown that this was anything other than bureaucratic sloppiness.

---

[10]/The Court notes some dispute as to the content of that conversation. Mike Smith wrote a note to Miller's file stating that in that conversation, he explained that Miller needed to come into work everyday, because they were moving into the peak season and Smith needed him. Miller states that the conversation was not about absenteeism, but about his schedule conflict.

[11]/The Court notes that in his deposition, Miller refers to a letter, dated October 27, 1999, in which he requested an immediate change in shift. *See* Miller Depo. 333-34. Neither party, however, has produced this letter. Plaintiffs have not argued that Mike Smith's failure to respond to this letter was in any way race-based.

Case No. 5:04-cv-1262
Gwin, J.

Thus, even were Miller able to make out a prima facie case, he does not raise an issue of fact as to pretext.

## B. Retaliation

In addition to his disparate treatment claim, Miller argues that UPS retaliated against him after he filed his discrimination charge with the EEOC, challenging his initial April 1999 termination.  Miller avers that he filed the charge in May 1999, although Defendants claim it was August 1999.[12/]  Specifically, Miller argues that UPS retaliated against him when it terminated him on November 10, 1999, and when it began to enforce its attendance policy more strictly in September 1999.  Further, Miller testified he believed UPS retaliated against him by changing his shift and failing to get him back on the early (preload) shift such that he could avoid schedule conflicts.

To make out a prima facie case of retaliation, a plaintiff must establish four elements: (1) that he engaged in protected activity under Title VII; (2) that the employer had knowledge of his exercise of her civil rights; (3) that the employer subjected him to an adverse employment action; and (4) that a causal connection exists between the protected activity and the adverse employment action.  *Ford v. GMC*, 305 F.3d 545, 552-53 (6th Cir. 2002); *Harrison v. Metro. Gov't*, 80 F.3d 1107, 1118 (6th Cir. 1996) (citing *Wrenn v. Gould*, 808 F.2d 493, 500 (6th Cir. 1987)).

Once the plaintiff establishes a prima facie case of retaliation, the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for its actions.  *Ford*, 305 F.3d at 552-553.  Then, the Plaintiff must demonstrate pretext - that is, that the Defendant's proffered reason was false, *id*. at 553.

---

[12/]UPS claims that Miller filed the EEOC charge in August 1999, but provides no proof of this date.  In fact, neither party has provided a copy of the actual EEOC charge or right to sue letter.  In its response to Defendants' summary judgment motion, Plaintiff, too, seems to focus only on the time period after August 1999.

Case No. 5:04-cv-1262
Gwin, J.

Here, the only disputed issue is the fourth prong, causal connection.  As to the fourth prong, Miller

need only proffer evidence "sufficient to raise an inference that [his] protected activity was the likely reason

for the adverse action." *EEOC v. Avery Dennison Corp.*, 104 F.3d 858, 861 (6th Cir. 1997).  No one

factor is dispositive, but temporal proximity and differential treatment of similarly situated employees are

factors to consider.  If Miller  indeed filed his EEOC charge in May 1999, as stated in his affidavit, the

Court is hard-pressed to find temporal proximity to the adverse action Miller claims he suffered as a result

– his termination six months later, in November 1999.

Miller may argue that the more proximate consequence was that UPS put him on a different shift,

a shift that conflicted with his schedule.  He has produced no evidence to suggest, however, that UPS knew

he would have a conflict when they moved him.  The shift change, in addition, produced no material change

in salary.  The company's failure to thereafter allow Miller to transfer back into the preload shift – or into

a later evening shift that would not affect other obligations – cannot amount to adverse treatment by itself,

and Miller has produced no evidence aside from speculation that UPS made such a transfer more difficult

for him than it did for other employees.  He testified that he observed two white employees easily transfer

into lateral positions, and that a fellow employee told him UPS's intransigence was unusual.  Miller has not

produced anything further to verify these observations.

The Court thus finds that Miller's retaliation claim has no merit.

## OLIN CLAY III
### I. Facts

Plaintiff Olin Clay began work with UPS on November 9, 1999.  He was one of seventeen other

-31-

Case No. 5:04-cv-1262
Gwin, J.

drivers, all formerly with Preston, to join UPS around that time.  Clay was the only African American in

the group.  Clay was scheduled to gain seniority status with UPS on November 15, 1999.  He actually

achieved seniority in June 2000.

Plaintiff Clay's instant complaint arises out of a series of events and interactions with UPS

supervisors that took place in 2000 and 2001, including his discharge in September 2001.   The various

UPS supervisors at play include Joseph Rudnicki, on-road feeder manager, Ginger Golobish, and division

manager Tom Piscitello.

The first event giving rise to Plaintiff Clay's complaint took place in the early morning hours of June

5, 2000, at the Middleburg Heights hub.  While waiting for the trailers to be loaded so he could drive the

shipment to their destinations, Clay kept his truck idle, and lay down on the truck seat.  Joe Rudnicki, the

on-road feed manager, whom Clay had never met before, approached the vehicle, and noticed Clay sit up.

 Rudnicki began to berate Clay for keeping the truck running idle, and for not knowing his pull time.  With

other drivers present, Rudnicki allegedly yelled at Clay and told him that he was going to "wage war" on

Clay.[13]

The second incident involved an alleged missed "switch" at Summit Racing.  On June 16, 2000,

Clay was asked to run a route he normally did not perform.  He was given a schedule with some outdated

information, which was supplemented by oral instructions from various supervisors and managers.  Clay

performed his duties according to instructions given to him.  His last job for the evening was to take an

---

[13]In his discrimination complaint to the Ohio Civil Rights Commision, Clay said that white drivers idling their
trucks at the same time were not reprimanded, but he has failed to produce any evidence.

Case No. 5:04-cv-1262
Gwin, J.

empty truck back to Summit Racing.  When he reached Summit Racing at 12:30am, the doors were closed and there was only one car in the parking lot.  The only lights on were the offices on the second floor.  Clay Aff. ¶ 44. Clay apparently asked dispatchers for further instructions, but received none.

On June 19, 2000, Clay received a call from Ginger Golobish, a manager, asking about a missed trailer pick-up at Summit Racing on June 16.  The next day, June 20, 2000, Golobish called a meeting in her office, and proceeded to berate Clay for failing to pick up the trailer, although Clay maintained that he had known nothing about it.  She screamed and pounded the table, and eventually threatened that she would "punish your brothers for what you did, and make sure they know it was you."  When asked by the union representative to explain what she meant by that statement, Golobish stated, "I'm going to punish your Teamster brothers."  Clay Aff. ¶ 53-55.

After the meeting, Clay filed a grievance, citing intimidation, coercion, and harassment.  A few days later, an Article 17 termination hearing was called to determine whether Clay should be fired for the missed switch.  The company did not terminate him but did threaten to give him a written warning.  At least one supervisor, after investigating further, found no reason to fault Clay for the missed switch.  Kris Donker Depo.

A couple months after the Summit Racing incident and the incident with Ginger Golobish, Plaintiff Clay filed yet another grievance, complaining that he and other drivers had not been qualified on the higher-paying triples runs, although they were qualifiable candidates. Triples runs involved driving three 28-foot trailers, typically on lengthy trips.  To qualify, a trainee must drive the run with a supervisor present.  Shortly after Clay filed the triples-run grievance, supervisor Joe Rudnicki confronted him on a run to New Stanton,

-33-

Case No. 5:04-cv-1262
Gwin, J.

Pennsylvania, and told him to drop the grievance.　　　　On December 18, 2000, Clay filed a discrimination

charge with the Ohio Civil Rights Commission, citing his interactions with Ginger Golobish and Joe Rudnicki

as instances of racially motivated behavior.  Around that time, Clay also began treatment with a psychiatrist.

Between January 2001 and March 2001, Clay was in a routine lay-off period, during which he did

not work.   Sometime in April 2001, Clay informed his employer that he was on medical leave, and he was

then listed as "o/o/s" (out of service) until the end of May.  Also in May, UPS appears to have been aware

that Clay had filed the discrimination complaint.  In mid June, Clay received his right to sue letter from the

EEOC.

A few days after receiving the right to sue letter, Clay received a call from a supervisor who

inquired as to Clay's upcoming vacation time.  Thereafter, UPS records reveal an increased interest in

Clay's whereabouts and grounds for his absence.  Between June and August 2001, Clay and UPS

attempted to communicate with each other, and Clay tried to procure and convey to UPS the medical

justification that UPS sought.  On July 9, 2001, Clay received a doctor's note indicating the period he had

been advised to be off, and saying he could then return to work.  According to Clay, he attempted to fax

the doctor's note to UPS several times before July 27, 2001.  The fax went through on July 27, 2001.

That same day, however, UPS wrote Clay a letter stating that it lacked adequate documentation

justifying his absence since January 2, 2001.  The letter demanded documentation by August 1 or else it

would consider him terminated.  Although dated July 27, the letter was not postmarked until July 30, and

Clay only received the letter on or after August 1.    In response, Clay sent additional medical

documentation to supervisor Tom Piscitello, who then asked for yet more.

-34-

Case No. 5:04-cv-1262
Gwin, J.

On August 9, 2001, Clay's doctor sent a report to UPS.  Between August 9 and August 20, UPS tried to reach Clay, on both his cell and home phones, to determine whether he was available to work Piscitello left messages for Clay suggesting that Clay come in to see a UPS doctor, per company policy. Clay returned two of the calls, on August 10 and August 17, leaving messages both times.  Nonetheless, UPS logs did not record the August 17 call.  On August 20, 2001, UPS sent a letter terminating Clay for unexcused absence.

Clay grieved the discharge and a hearing was held.  The notes from the September 19, 2001 grievance hearing state: "set up appointment with doctor.  Olin will make himself available to work."  On Friday, September 21, 2001, Clay was examined by a UPS doctor.  According to Clay, the doctor indicated he would fax a letter to UPS, but did not tell Clay whether he was released to return to work. UPS received the fax from the doctor that afternoon, indeed releasing him to return to work.  UPS called Clay that day, because they had work for him.  The log listed Clay as "available for work."  On Monday, September 24, UPS called Clay again, and again on September 25.  Clay did not respond.  On Tuesday, September 25, Clay also went to the emergency room.  On Wednesday, September 26, Clay received a cell phone message from dispatch, and returned the call.  The same day, Piscitello wrote a letter terminating Clay for missing three consecutive days of work.  The letter was postmarked September 28, 2001.  Clay grieved the termination, and the discharge was upheld.

II. Analysis

A. Disparate Treatment

Plaintiff Clay alleges UPS subjected him to disparate treatment in three different instances: first,

-35-

Case No. 5:04-cv-1262
Gwin, J.

when it failed to train him on triples runs; second, when Golobish accused him of missing a switch and said she was going to "punish" his "brothers"; third, when Rudnicki reprimanded him for idling the truck; and fourth, for terminating him.

As mentioned, where a plaintiff relies on circumstantial evidence to prove racial discrimination, he must prove the four *McDonnell Douglas* factors: (1) he is a member of a protected class; (2) he suffered an adverse employment action; (3) he was qualified for the position he sought or lost; and (4) he was treated less favorably than a similarly situated white employee. *Braithwaite v. The Timken Co.*, 258 F.3d 488, 494 (6th Cir. 2001). To win on the fourth prong, a plaintiff must show that a comparable, non-protected employee was similarly situated to her in all relevant aspects, yet treated more favorably by the Defendant. *Clayton v. Meijer, Inc.*, 281 F.3d 605, 611 (6th Cir. 2002). When an employee is terminated, he can satisfy the fourth element of a circumstantial claim by showing he was replaced by a person outside the protected class. *See Clayton v. Meijer, Inc.*, 281 F.3d 605, 610 (6th Cir. 2002).

Here, Clay loses on any claim that UPS's failure to train him on triples runs constituted disparate treatment. Clay cannot show a genuine issue of fact that similarly situated employees were treated more favorably than he was. To show "similarly situated," a plaintiff must show that he was similar to others in all "relevant aspects." *Clayton v. Meijer, Inc.*, 281 F.3d 605, 611 (6th Cir. 2002). Here, Clay filed his grievance challenging the lack of triples training on behalf of himself "and others," meaning the other drivers who started with him at UPS. All of these other drivers were white. That he filed the grievance on behalf of himself and white drivers suggests that the failure to train did not uniquely disadvantage Clay as a black

-36-

Case No. 5:04-cv-1262
Gwin, J.

employee.  Indeed, once UPS resumed training feeder drivers for triples-runs,[14] he was treated more

favorably than two white drivers who had greater than seniority than he: Clay was the first to be scheduled,

before P. Ramey and E. Lepsik. *See* Rudnick Dec; *see also* Clay Depo.  Thus, UPS's failure to train Clay

on triples runs cannot support a disparate treatment claim.

Similarly, Clay loses on any claim that Rudnicki's reprimand regarding Clay idling his truck

constitutes disparate treatment.  Clay has presented no evidence to raise an issue of fact that Rudnicki

treated a white employee idling his truck differently.  More importantly, no adverse employment action

flowed from Rudnicki's treatment of Clay.  Rudnicki filed no disciplinary action against Clay.  As

mentioned, a reprimand is not an adverse employment action unless "accompanied [by] some other action."

*Howard v. Bd. of Educ.*, 70 Fed. Appx. 272, 281 (6th Cir. 2003) (internal quotation marks omitted);

*Broska*, 70 Fed. Appx. at 267 (holding that a warning letter and singling an employee out for criticism did

not constitute adverse employment action).

Nor does Clay raise a genuine issue of fact that Ginger Golobish's abrasive comment that she

would "punish" Clay's "brothers" constitute racial discrimination, even though the comment may have been

enough for Clay's grievance to constitute a protected activity.  No adverse employment action was

ultimately taken, as Clay was not terminated.  Moreover, the evidence that Clay has presented tends to

show that Golobish treated all employees poorly, not singling out black employees.  Golobish may have

had poor interpersonal skills, but such a shortcoming does not translate necessarily into race discrimination.

---

[14]/UPS has presented evidence that it had no supervisors available to train drivers on triples runs between
February 2000 and August 2000, and thus trained no one at that time.  Even if Clay could make out a prima facie case,
this constitutes a legitimate, nondiscriminatory reason for which Clay has not put forth sufficient evidence of pretext.

Case No. 5:04-cv-1262
Gwin, J.

Finally, Clay claims that his termination was racially motivated.  Here, in order to prove the fourth prong, Clay need only show that he was replaced by a non-protected employee, *i.e.*, a white employee. Clay, however, has made only a bald assertion that his job went to the next most senior employee, a white driver.  He has produced no evidence to refute UPS's averment that in fact, Clay's place on the seniority list was not filled, and that Clay's responsibilities were divided up among the existing drivers.  "Spreading the former duties of a terminated employee among the remaining employees does not constitute replacement."  *Lilley v. BTM Corp.*, 958 F.2d 746, 752 (6th Cir. 1992).  In the alternative, Clay fails to show that UPS treated him differently from any similarly situated employee, when it terminated him.  Thus Clay fails to meet the fourth prong of the prima facie test, and fails to raise a material issue of fact with regard to any of the bases he proffers for his disparate treatment claim.

## B. Retaliation

To make out a prima facie case of retaliation, a plaintiff must establish four elements: (1) that he engaged in protected activity under Title VII; (2) that the employer had knowledge of his exercise of her civil rights; (3) that the employer subjected him to an adverse employment action; and (4) that a causal connection exists between the protected activity and the adverse employment action.  *Ford v. GMC*, 305 F.3d 545, 552-53 (6th Cir. 2002); *Harrison v. Metro. Gov't*, 80 F.3d 1107, 1118 (6th Cir. 1996) (citing *Wrenn v. Gould*, 808 F.2d 493, 500 (6th Cir. 1987)).

Once the plaintiff establishes a prima facie case of retaliation, the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for its actions.  *Ford*, 305 F.3d at 552-553.  Then, the

-38-

Case No. 5:04-cv-1262
Gwin, J.

Plaintiff must demonstrate pretext - that is, that the Defendant's proffered reason was false, *id*. at 553.

The Court addresses each element in turn.

### 1. Protected Activity

Under the opposition clause of Title VII, an employee engages in protected activity when he or she opposes an employer's practice that violates Title VII. *Johnson v. Univ. of Cincinnati*, 215 F.3d 561, 578 (6th Cir. 2000), *cert. denied*, 531 U.S. 1052 (2000). The employee must show that she "reasonably believe[d] that she was opposing a racially discriminatory employment practice." *Offutt v. Warren County Reg'l Jail*, No. 03-6108, 2004 U.S. App. LEXIS 19098, *7 (6th Cir. Aug. 31, 2004). A letter constitutes protected activity when it complains about an employee's unequal treatment. *See Willoughby v. Allstate Ins. Co.*, 104 Fed. Appx. 528, 530 (6th Cir. 2004) (holding that the plaintiff's letter to an employer was not protected activity when it did not challenge unequal treatment but was merely upset about the employer's decision).

In this case, Clay filed several grievances with UPS throughout Summer and Fall 2000, and a complaint with the Ohio Civil Rights Commission in December 2000. The three grievances that Plaintiff has submitted into evidence include the following: (a) the June 27, 2000 complaint against Ginger Golobish's behavior and comments after Clay allegedly missed the Summit Racing switch; (b) the August 18, 2000 complaint that Plaintiff "and others" had not been qualified to pull triples runs, although they were qualifiable candidates; and (c) the August 25, 2000 complaint against supervisor Joe Rudnicki for confronting him about filing the August 18 grievance, and asking him to drop the complaint because "things aren't done that way here." The complaint with the Ohio Civil Rights Commission refers to Ginger

-39-

Case No. 5:04-cv-1262
Gwin, J.

Golobish's comment that she would "punish" Clay's "brothers" for his alleged mistake, and states that he was threatened with termination, even though he was not at fault. The OCRC complaint also refers to action by supervisor Joe Rudnicki, on June 5, 2000, in which Rudnicki stated that he would "wage war" on Clay for idling his truck. The complaint states that a Caucasian driver next to him was also idling his truck, yet Rudnicki said nothing to that driver.[15]

As to the three grievances, only the first can be considered a "protected activity." Clay's complaint (the second listed above) that he "and others" had not been qualified to pull triples runs does not qualify as protected activity, because Clay had no basis for believing he was opposing a racially motivated practice. Indeed, the "others" he was referring to were the drivers who had been hired at the same time as he had, all of whom were white.[16] He points to no evidence showing that the training was unequal on racial grounds, or that he believed it to be so at the time he filed the grievance.

Because Clay's triples-runs grievance was not a protected activity, neither was his grievance (the third listed above) complaining that Rudnicki asked him to drop it. In his grievance, Clay wrote that he felt "harassed, coerced, and intimidated," but he offers no evidence suggesting that Rudnicki was racially motivated in approaching Clay, or that he reasonably believed Rudnicki to be racially motivated. Given that the triples-run grievance did not reasonably oppose a racially motivated practice, without more, neither did the Rudnicki grievance.

---

[15]We note that, although Plaintiff Clay's OCRC complaint states that he filed a grievance following the June 5, 2000, incident with Rudnicki and the idling truck, he has not submitted any copy of that grievance.

[16]Indeed, ultimately, Clay was trained on triples even before white drivers of higher seniority. See Rudnicki Dec.

Case No. 5:04-cv-1262
Gwin, J.

Of the three grievances, then, only the Ginger Golobish grievance is left standing.  In that grievance, Clay complained about Golobish "on the basis of intimidation, harassment, coercion, overly supervising and unprofessional behavior."  Although this language does not directly cite racial discrimination, Clay also submitted to UPS a written statement of events in which he detailed  his conversation with Golobish, including her statement that she would "punish your brothers" for Clay's mistake.  In that statement, written on June 25, 2000, he characterized the comment as a "racial slur."  The Court emphasizes that for purposes of this claim, it need not decide whether Golobish's statement in fact constituted racial discrimination.  For purposes of the retaliation claim, it is enough that Clay had a good faith belief that he was opposing a racially motivated practice, or unequal treatment, in submitting a grievance with an accompanying statement. *See Booker v. Brown & Williamson Tobacco Co.*, 879 F.2d 1304, 1312-13 (6th Cir. 1989) ("A person opposing an apparently discriminatory practice does not bear the entire risk that it is in fact lawful; he or she must only have a good faith belief that the practice is unlawful.")

Finally, Clay's OCRC complaint was protected activity, because he directly references race and unequal treatment between him and a Caucasian driver[17].  Thus, Clay identifies two protected activities.

### 2. Employer's Knowledge of the Protected Activity

The Defendants do not dispute that they had knowledge of Plaintiff Clay's exercise of his rights. Clay filed his grievance with regard to Golobish's behavior with UPS.   With regard to the OCRC complaint, the evidence shows that sometime around May 1, 2001, UPS became aware of Clay's

---

[17]/Again, this Court does not decide whether the referenced treatment was in fact discriminatory.  For purposes of the retaliation claim, it is enough that Clay could reasonably have believed he was opposing a racially motivated practice.

Case No. 5:04-cv-1262
Gwin, J.

complaint. *See* Exh. (Rudnicki responding to human resource manager's query regarding Clay's civil rights

charge). Around June 18 or 19, UPS received a copy of Clay's EEOC right to sue letter. Thus, Plaintiff

meets this prong of the retaliation test.

### 3. Adverse Employment Action

An adverse employment action is something more than a threat of discharge. *See Hollins v.*

*Atlantic Co.*, 188 F.3d 652, 662 (6th Cir. 1999).  It is a "'materially adverse change in the terms or

conditions of . . .  employment because of [the] employer's conduct.'"  *Broska v. Henderson*, 70 Fed.

Appx. 262, 266-67 (6th Cir. 2003) (quoting *Policastro v. Northwest Airlines, Inc.*, 297 F.3d 535, 539

(6th Cir. 2002)).  A change in employment conditions "must be more disruptive than a mere inconvenience

or an alteration of job responsibility." *Kocsis v. Multi-Care Mgmt. Inc.*, 97 F.3d 876, 886 (6th Cir.

1996) (internal quotation marks omitted).

The Sixth Circuit has cautioned the element of adverse employment action "must not be interpreted

too broadly" because adverse employment action is a judicially-created element designed to "filter" suits

over hurt feelings. *See White v. Burlington Northern & Santa Fe Ry.*, 364 F.3d 789, 802 (6th Cir.

2004) (en banc).  A "bruised ego" is insufficient for liability under Title VII.  *Kocsis*, 97 F.3d at 886

(internal quotation marks omitted).  Similarly, a reprimand is not an adverse employment action unless

"accompanied [by] some other action." *Howard v. Bd. of Educ.*, 70 Fed. Appx. 272, 281 (6th Cir.

2003) (internal quotation marks omitted); *Broska*, 70 Fed. Appx. at 267 (holding that a warning letter and

singling an employee out for criticism did not constitute adverse employment action).

In this case, Clay's termination unquestionably constituted an adverse employment action.

-42-

Case No. 5:04-cv-1262
Gwin, J.

However, any threat of discharge or warning he received pursuant to the June 2000 hearing held after the

incident with Ginger Golobish did not constitute an adverse employment action.  Clay has produced no

evidence to suggest that he suffered any "material[] adverse change in the terms or conditions of

...employment" as a result of Ginger Golobish's action.  Thus, the only relevant adverse action he suffered

was the September 2001 termination.

### 4. Causal Connection

To prove a causal connection, a plaintiff must produce evidence sufficient to support an inference

that the employer took the adverse employment action because she filed a discrimination charge.  *See*

*EEOC v. Avery Dennison Corp.*, 104 F.3d 858, 861 (6th Cir. 1997).   In establishing a causal

connection, "no one factor is dispositive."  *Nguyen v. City of Cleveland*, 229 F.3d 559, 563 (6th Cir.

2000).  One factor is temporal proximity between the protected act and adverse employment action.  If

the adverse action was taken "shortly after" the plaintiff engaged in protected activity, this is evidence

"relevant to causation."  *Id.* at 563; *Byrd v. Stone*, No. 97-1841, 2000 U.S. App. LEXIS 441, *9 (6th

Cir. Jan. 6, 2000) (emphasizing the close timing between the protected conduct and the adverse

employment action in finding a prima facie case of retaliation)*; DiCarlo v. Potter*, 358 F.3d 408, 420 (6th

Cir. 2004) (inferring causation when the employer terminated the employee less than one month after she

filed her EEOC claim).   When several months lapse between the protected activity and adverse

employment action, temporal proximity is insufficient to support an inference of retaliation.  *See Cooper*

*v. City of N. Olmstead*, 795 F.2d 1265, 1272 (6th Cir. 1986) (holding that a four month time period

between protected activity and adverse employment action was insufficient to show causal connection).

-43-

Case No. 5:04-cv-1262
Gwin, J.

Here, there is absolutely no connection between Clay's grievance filed in June 2000, regarding Ginger Golobish's disciplinary treatment, and Clay's termination in September 2001.  However, whether there is a causal connection between Clay's OCRC complaint and his termination requires a closer analysis.

Clay filed his OCRC charge on December 18, 2000.  From around that time to March 2001, he was in a routine lay-off period, during which he did not work.  Plaintiff makes no claim that this period was in any way related to his filing a discrimination complaint.  Sometime in April 2001, Clay informed his employer that he was on medical leave, and he was then listed as "o/o/s" (out of service) until the end of May.  At some point in May, UPS appears to have been aware that Clay had filed the discrimination complaint.  And in mid June, UPS received a copy of his right to sue letter from the EEOC.

A few days after receiving the right to sue letter, Clay received a call from a supervisor who inquired as to Clay's upcoming vacation time.  Thereafter, UPS records reveal an increased interest in Clay's whereabouts and grounds for his absence.  In addition, UPS terminated him twice after June, once despite the medical documentation he provided..

The above sequence of events is sufficient to satisfy the low prima facie burden in a retaliation case.  Clay was terminated just three months after UPS received a copy of his EEOC right to sue letter.  This evidence alone does not create a genuine issue of fact in this case.  However, other evidence alongside the temporal proximity creates an issue of fact: UPS's sudden and revived interest in Clay's whereabouts, and the fact that Clay was terminated in both August and September.

Although Clay succeeds in overcoming the prima facie threshold, UPS has also succeeded in

-44-

Case No. 5:04-cv-1262
Gwin, J.

putting forth a legitimate, nondiscriminatory reason for the termination: Clay's failure to report to work once he was back on schedule or to return UPS's phone calls.  Indeed, Clay's own tape transcripts detail the efforts that Clay's supervisors made to reach him in August.

Clay claims that the company's proffered reason is pretextual on the following bases: (a) Between September 21 and 26, 2001, the period when UPS states he missed three consecutive days of work, dispatchers called only his cell number, although they had been calling both the home and cell numbers the month before; (b) The company sent him a warning letter on July 27, despite knowing his justification and despite having received the doctor's medical note; (c) UPS delayed in sending both the July 27 warning letter and the September 26 termination letter at least two days after dating it, in the former case allowing no time for Clay to respond; (d) the Ginger Golobish and Rudnicki incidents from 2000.[18]

Clay's reasons do not raise an issue of fact as to pretext, because there was nothing illegitimate or contradictory in UPS's actions.  The evidence shows that Clay gave UPS his *cell phone number* as the one number for dispatch to call when it had work for him.  Clay claims that just the month before, UPS contacted him both at home and on his cell.  But that was the Tom Piscitello, the division manager, not dispatch.  Even if Clay expected UPS to call him at home, there was nothing illegitimate about the fact that UPS tried him on his cell, the number Clay himself provided.

Similarly, UPS's July 27, 2001 letter was not out of line with UPS practice or policy.  Clay admits

---

[18] Plaintiff raises another basis, although only in a footnote in his brief:  Clay contends that he missed only two consecutive days of work, not three, since Saturday, September 22, was a working day at UPS.  *See* Rudnick Depo.  That UPS may have been mistaken, however, does not raise an issue of fact as to pretext.  *See Billups v. Methodist Hosp.*, 922 F.2d 1300, 1304 (7th Cir. 1991) ("[O]ur inquiry in this case is not whether the alleged acts actually occurred.  Rather, our inquiry is limited to whether the employer's belief was honestly held.").

Case No. 5:04-cv-1262
Gwin, J.

that Piscitello told him at the grievance hearing that he needed to see a company doctor. He had earlier

left a message to this effect on Clay's answering machine.

With regard to the delayed postmarking, this again appears to be a matter of company practice.

As Piscitello declared, "It is my practice to sign letters on the day that they are dated. The July 27, 2001

and August 21, 2001 letters to Olin Clay were signed and then sent to the District Labor Department to

be mailed by certified mail. This is my regular practice for mailing certified letters to union employees."

Piscitello Dec. ¶ 6. Without further evidence that Clay was treated differently from other UPS employees,

the bureaucratic delay does not raise an inference of pretext.

Finally, Clay argues that the incidents with Ginger Golobish and Joe Rudnicki from the year before,

in June and August 2000, suggest a pattern of treatment giving rise to an inference that Clay's termination

was pretextual. In some instances, evidence of past disparate treatment can suffice to raise an issue as to

pretext. However, in this case, even if the cited incidents constituted disparate treatment – which the Court

has above found that they did not – the events were too few, isolated, and far before the termination to

raise an issue of pretext in the termination over a year later.

The Court thus finds that Plaintiff Clay has failed to raise an issue of fact as to pretext. His claim

of retaliation fails.

### C. Racial Harassment/Hostile Work Environment

Plaintiff Clay brings a hostile environment claim under 42 U.S.C. § 1981, as well as under O.R.C.

§ 4112.02(A) and § 4112.99. As mentioned above, in order to establish a prima facie case of hostile

work environment based on race, a plaintiff must show that (1) he belongs to a protected group; (2) he was

Case No. 5:04-cv-1262
Gwin, J.

subjected to unwelcome harassment; (3) the harassment was based on race; (4) the harassment had the effect of unreasonably interfering with the plaintiff's work performance by creating an intimidating, hostile, or offensive work environment; (5) the employer knew or should have known of the harassment in question and failed to take appropriate remedial action. *Hafford v. Seidner*, 183 F.3d 506, 512 (6th Cir. 1999) (citation omitted). Where the harassment is allegedly committed by a supervisor with immediate authority over the victim, the plaintiff employee need only satisfy the first four elements set out above. *Faragher v. City of Boca Raton*, 524 U.S. 775 (1998). Further, the Sixth Circuit has recognized a cause of action for retaliatory harassment. *See Morris v. Oldham County Fiscal Court*, 201 F.3d 784, 792 (6th Cir. 2000) ("[S]evere or pervasive supervisor harassment that is engaged in because an individual 'has opposed any practice made an unlawful employment practice' by Title VII also can constitute 'discrimination' under 42 U.S.C. § 2000e-3.").

In order to meet the fourth prong, a plaintiff must show, both subjectively and objectively, that "the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive work environment." *Harris v. Forklift Sys, Inc.*, 510 U.S. 17, 21 (1993) (internal quotations and citations omitted).

Here, the statements and events that Clay cites do not raise an issue of fact that he suffered a hostile work environment. Clay cites the following as instances of racial harassment: Golobish's comments and reference to "punishing" his "brothers"; an alleged threat by then Akron Division Manager Kris Donker that if Clay taped the local grievance hearing, he would fire him; that dispatch supervisor Natalie Greenfield verified a call too early and had no intention of calling him for a particular run; the circumstances

-47-

Case No. 5:04-cv-1262
Gwin, J.

surrounding his termination.  None of these instances, either individually or collectively, rise to the level of

racial harassment.  Golobish's comment cannot be considered a racial epithet in the context in which she

spoke it, as she stated she was referring to the union brothers.  Moreover, even if it was, it would have

been an isolated occurrence, not enough to rise to the level of "severe or pervasive."  Further, Clay has

produced insufficient evidence to suggest that Donker's alleged threat and Greenfield's conduct were

motivated by race, or that they interfered with his ability to work.  Finally, as discussed above, Clay cannot

prove that this termination was due to race.

Further, insofar as Clay may argue that he suffered retaliatory harassment when Rudnicki stopped

him in New Stanton, Pennsylvania, to ask that Clay drop his triples-run grievance, Clay's claim fails

because he cannot show that any harassment he may have suffered was "severe or pervasive."

Thus, Clay's racial and retaliatory harassment claim has no merit.

## CONCLUSION

In sum, the Court GRANTS summary judgment as to Clay's claims and Miller's claims. The Court

GRANTS summary judgment as to Moss's hostile environment claim, but DENIES it as to Moss's

disparate treatment claim, specifically, regarding Moss's transfer to the Wadsworth facility as a pre-load

clerk.

IT IS SO ORDERED.

Dated: June 30, 2005                                    s/          *James S. Gwin*

                                                       JAMES S. GWIN

                                                       UNITED STATES DISTRICT JUDGE

-48-